At this time, I would like to ask the Appellant, please, to introduce himself or her. Good morning, Your Honors. Once again, and may it please the Court, Jonathan Taylor for the Plaintiff Appellant, John Conti, and if I may, I'd like to reserve three minutes for rebuttal. You may. This case involves a Rhode Island law that all mortgage lenders, not just banks, are required to make annual interest payments to borrowers on funds placed in mortgage escrow accounts. Mortgage lenders must pay interest at the rate of their existing savings accounts if offered or otherwise at a rate set by the Director of Business Revenue, which has been 0.05 percent for the last 12 years. The District Court held that this law is preempted as applied to national banks because it places limits on their implied power to establish escrow accounts. In doing so, the Court did not make any practical assessment of the nature and degree of the law's interference with that asserted power, much less explain how it could be significant. Instead, the Court relied on the Second Circuit's decision in Cantero, which applied a similar test, the so-called control test, to declare a similar state law preempted. We now know that the District Court's analysis was wrong because the Supreme Court has told us that it was wrong. The standard for preemption in this case is whether the state law prevents or significantly interferes with the exercise of a national banking power. And the Supreme Court in Cantero unanimously held that a court must make a practical assessment of the nature and degree of the interference caused by a state law to determine whether it rises to the level of being significant. The Supreme Court held that the Second Circuit's control test is inconsistent with that nuanced practical inquiry because it would, quote, preempt virtually all state laws that regulate national banks except for generally applicable contract and property laws. And the Supreme Court vacated and remanded for the application of the correct standard. And given the Supreme Court's decision in Cantero, this Court now has three options before it. Number one, it could do as the Supreme Court did in Cantero and vacate and remand. Number two, it could affirm on the supposedly alternative rationale offered by my friend on the other side. Or third, it could reject that argument and reverse. And if I may, I'd like to walk the Court through each of these options. The first option, vacater, is the most minimalist. And no one could fault this Court if it took that route. If there's one thing we know from reading the District Court's decision in this case, it's that its analysis conflicts with Cantero. And if there's one thing we know from reading Cantero, it's that vacater and a remand is an appropriate disposition. And so this Court could simply follow that path and call it a day. Counsel, can I ask you about the vacater option? Because I think you argue in your brief, or I want to make sure I understand, if you're asking for factual development, or is that not necessarily your position? Well, I think I wouldn't go quite that far. I think what this Court should do is what the Supreme Court did in Cantero, which is vacate and remand for application of the correct test in the first instance. And the correct test requires an examination of the text and the structure of the particular laws at issue. But if you're not asking for facts, we can do that as well as Judge McElroy can do that. So I guess you've put forward vacater as one option. Yes. And you anticipated... So we're talking about that one now. Yes. So do you, I mean, between the options, as you read Cantero, as best you can, do you understand it to be telling judges that to determine whether there's significant interference, that requires a factual assessment of what's happening in the banking world? Do you agree or disagree with that? I think it has a factual component. And I think that that necessarily, I mean, has to be the case because the test requires a practical examination of the impact of a state law. And that requires some examination of what that impact is in the real world. That being said, I wouldn't go so far as to say you can't, you know, you've got to deny the motion to dismiss in every case. And in fact, the Supreme Court has not done that. And if you look at, there's a footnote in Cantero, I want to say it's footnote three, but forgive me if I'm wrong. It is footnote three. Okay, so when we've done it in the past, we've been able to do it based on an examination of the text and structure of the laws. So that works well when it's an express power. Right. And here it's an incidental power. Right. And so one question I have is how do we even define the incidental power? Is the incidental power to have a mortgage account, escrow account? Is the incidental power to have a no interest mortgage account? I mean, how do you define that? I mean, I think I would go back to first principles here. I mean, preemption is ultimately a question for Congress. And so I think you should look first at whether the Supreme Court has said anything particular on the subject. It hasn't here. I think that is telling. It makes it quite different from the cases where the Supreme Court has found significant interference. The Congress has said nothing at all. I can't find anywhere really has found significant, of the cases. Which one do you think is the most where they have found significant interference? I mean, they talk, people try to suggest it's Franklin. But really, when I read Barrett Bank and I read Franklin, it looks more like that's a preventing kind of case, more than, at least that's how I read Barnett Bank to be describing it. It says it's just like Barnett Bank. And Barnett Bank seems to be clearly a preventing. So what do you understand significant interference to be? Well, I think it's probably something that imposes a similar kind of practical effect. It wouldn't go so far as to entirely prohibit the National Bank from engaging in the activity that Congress has given it the power to engage in. But it's got to have some real significant effect. And I think that, you know, we know that. You asked me for a case, I think. You know, the case that my friend might cite as the case that is maybe the best case for their side would be the San Jose case, where that case involved a state law that governed abandoned accounts. But there, it actually was a little bit unique in that it didn't require a finding of abandonment and just simple inactivity over a period of time was enough to have the funds revert to the state. And the Supreme Court there said that that worked a kind of unusual and harsh alteration of the contracts of deposit. And that's the way the Supreme Court in Anderson later understood it. And the reason that mattered is because that significant practical effect would work to deter depositors from placing their funds in national banks in the first place. So that's the kind of... Counsel, so that deterrence language, which I think you also rely on in your briefing, that sort of goes back to the question I asked you, which is usually when you think about or not usually, but sometimes when you think about deterrence, it's helpful to look at facts. And as you said, we're supposed to make a practical assessment. But when I read through all of the actual cases that we're supposed to be applying here, I didn't actually see any facts considered by the court in the sense of fact-finding by a lower court. I saw the court using common sense and its understanding of maybe what you would call legislative facts or background facts, but no actual finding of fact in the sense of a summary judgment record or a trial court record. Did I miss anything? Do you agree with that? You did not. I mean, I'd make maybe one sort of offering, which is that if you look at the trial court's decision in the Franklin case, there was actually a trial that examined the degree to which the state law in that case worked a significant impairment of the ability of national banks to actually exercise the specific power that Congress had granted. But none of that was referred to. But none of that... I mean, there was a nod to it in the Supreme Court's opinion. It said, look, there's a voluminous record. But ultimately, the court resolved the case by looking to the text of the statute before it. Maybe the record in the case gave it some confidence that the word that Congress had selected, which is the word savings, mattered in the real world. And a state couldn't disable national banks from using the very word that Congress had used in the statute. And so... And to Judge Aframe's earlier question, is that actually perhaps the best case that's about significant interference? Because it doesn't strike me as a prevention case. It does strike me as, we've told you you can have savings accounts. This law is preventing you from letting people know you can have savings accounts. And that's actually really going to get in your way of doing what we've permitted you to do. It's not an outright prohibition by any means, but it's a big obstacle to it. I think that's exactly right. The reason I mentioned the San Jose case is there, there's a federal statute that used specific language and the Supreme Court relied on that specific text. But you're right. I think ultimately the court's decision is best conceptualized as a significant interference case. Because banks could still offer the product that they had been authorized to offer under federal law. They just couldn't call it the same thing that Congress had called it in the federal statute itself. And in the, you know, using the term that was most closely associated with the product in the minds of consumers. And that worked a real world harm. So I think that case is relevant for significant impairment. But it still didn't stray too far from the statutory text. And that makes sense because ultimately preemption is a question for Congress. And so what you have here is a statute. I think the statute, to get back to your question, Judge Afram, we're willing to spot them that the relevant power is the implied power to offer mortgage escrow accounts and that banks have that power. But for purposes of preemption, Congress hasn't said anything particular on this subject. The OCC hasn't even endeavored to engage in any kind of rulemaking that is specific to that power. And we don't have any kind of record here. And what you have instead is a state law that is almost self-evidently reasonable. They have said something in TILA, right? I mean, so they, so let me just play this out with you. So in 2004, the OCC has a regulation that says you can't have interest bearing, you're not, national banks do not need to have interest bearing escrow accounts. Then in 2008, Congress does this, but at the same time they say, for certain ones, if states are applying it, you national banks have to do this. And then in 2011, just before Dodd-Frank, but even put that aside. One way to look at that is Congress is legislating with the understanding that this thing is preempted, and we're going to carve out an exception knowing that this thing is preempted because we don't want it preempted as to these certain kinds of loans, which suggests maybe they understand that it was preempted as to the others, because the 2004 regulation is there. That's right. I don't think that's a fair reading of what Congress did. I think what Congress did in Dodd-Frank in 1639D is, so it makes the establishment of these mortgage escrow accounts mandatory for purposes of certain covered mortgages. And what it's saying at the time that it's doing that is, don't understand this to require some kind of alteration of the preexisting state law with respect to whether you've got to pay a mortgage interest on those account balances. And so I think it's almost as sort of just a kind of savings clause just to ensure that what it was doing wouldn't be understood to have any sort of preemptive effect. So I don't know if it really sort of ends up mattering much to this case one way or the other, and there might be a reason why the Supreme Court didn't make much have in its decision. So I don't know how far you can go with that. So Franklin, if that's the best significant interference case, which Justice Breyer in Barnett, I think, is really characterizing it as a prevention case. But I agree that it is because if the evidence showed that national banks are just rolling in savings accounts, there's no problem here, then it's hard to see what the significant interference is. That's right. And here, I guess there was some evidence somewhere that there was a problem caused by the regulation. And so here, I guess it seems like how would we know that? I have no idea how much interest is enough interest for a bank to say, we don't want to be in the real estate business anymore. That's too much interest. I tend to don't think it's .005%, but I guess, but I don't know that. So it does strike me as like this seems like a cascading, like Congress wants to preserve lots of laws. Tell me if this is the wrong way to think about it. It's an only if. It's an only if. State consumer financial laws are directed at anything that deals with the transaction.  Whether you're going to be paid interest or not seems to be part of the transaction. Yep. Then Congress puts three buckets. Yep. It says discrimination, prevention, significantly interferes. Kind of in a cascade. If it's discrimination, forget it.  Prevention is when, according to Barnett Bank, Congress says, you may do something and then the state says, you can't do the thing that the National Bank Act said you may do. Correct. That's what I understand at Barnett Bank. And that's a problem. And then you're in the third bucket, which seems to me to be way down the stream, which is when the burden would have to be on the bank to show in some really significant way that this is interfering with us doing the thing we're allowed to do. And I understand how that could have made, well, I don't understand necessarily how it worked in Franklin, but how can it work here without some record of some kind? How would we do that? And I guess I'm not, maybe that's a helpful question to you, but am I explaining it in a way that makes sense? I honestly couldn't have put it any better myself. And I also couldn't put my response any better than the way you put it, Judge Howard, in your Bowler decision from 2003, where you recognized that this exact preemption inquiry is better made on a record. There should be factual development if you're looking to the practical effect. And is that unusual in the world? So this is the part I don't fully understand. So this is Citizens Bank. They may make a terrible record. And then somebody else decides to sue Bank of America, and they make a fantastic record. And they show why Bank of America is never going to do mortgages anymore if this statute's in place. How do courts deal with that, which seems, at least in the surface, weird in the preemption world? It is a bit weird. I mean, it's the regime that Congress has required. And so it's the regime that we all have to live with. And I think the reason why you haven't seen a lot of cases like this over the last 20 years is once the OCC put out its rule, courts tended to kind of reflexively defer to that, which is one reason why Congress saw fit to intervene in 2010 and say, look, no, really, this isn't OK. So does it work itself out in the following way? Let's just keep with Bank of America, right? They show it's a significant—they show some district judge somewhere says that's a significant interference. That gets—goes up the system, and the Supreme Court ultimately says, yep, that's significant interference. It's preempted. It's still up to every national bank as a matter of business to decide whether it wants to follow that law and pay interest or not, because that may be helpful to get clients. It may not. Is that how it would work, that the one where—if it's not preempted, everybody just has to go along and follow it. But if it's not preempted—if it is preempted, then it presumably becomes a big deal and goes up the chain of the judicial authority, and then it gets resolved, and then it's just up to each individual bank to decide what to do. I think it's something like that. I mean, here's what I would say. Let's say someone sues a bank, and the bank loses. Then other banks presumably are going to follow the state law unless they think they can build a better record for some reason, and—or they have access to kind of different evidence that might allow the court to make a preemption determination. What if that other evidence is—consists of legislative facts? Would that be permissible? I mean, I think the court can consider anything that might bear on the question, including if the OCC had anything to say on the subject, right? And I think—I think you could expect if there's a law that's— Once you have a preemption determination that something is preempted based on legislative type fact-finding, doesn't that answer the question for all time? I think it would. And I think that just the point that I'm making is I think that although it's kind of a theoretical possibility that you could see disparate results for different banks depending on the particular records in a case, I think that's unlikely to come to pass. And I think the reality is that, you know, the result of a particular case is going to govern going forward. But if you had some kind of chaos that, you know, sort of were unleashed, I think you could expect the OCC to be pretty quick with a rule that endeavored to identify the particular consequences of compliance with state law and to explain why, if it thought it was a problem, that law should be preempted. And then a court could review that record and— Counsel, isn't that actually exactly sort of what Congress provided for by saying that OCC could decide on a case-by-case basis? So if there was a ruling of no preemption by a court, but a particular bank thinks that in a particular state there's a real problem, that's exactly what it says, right? I think in subsection B3 is the OCC can apply Barnett Bank to preempt state laws on a case-by-case basis after assessing the impact of a particular state consumer financial law on the national bank. So there's room to do both, it seems like, in the scheme that Congress created. That's exactly right. So it shows that the OCC does have a limited role to play here. And it also shows—it tells you something about what the substantive preemption standard is, which is going to take account of the facts on the ground. I mean, that's—the OCC is required to identify substantial evidence supporting its preemption determination in order for a court to defer to it even under a Skidmore deference. And so I think Congress was evidently of the view—the same view that you had, Judge Howard, which is that in some cases this requires some examination of the facts. In other cases where you've got—either you're in discrimination land or prevents land or you have the kind of stark practical impediment that existed in Franklin where you're looking at the text of a statute and you can make that determination, then you're not going to need to look at the facts. But in some cases in the middle where it's a genuinely close call and where courts are asked to just try to figure out whether a particular interest rate is too much, for example, that determination is going to be better made on an evidentiary record. I would also note that I'm pretty skeptical that a 0.05 percent interest rate that you make—you pay out once per year could have any kind of significant interference with the operations of the bank or even the bottom line. And I would also note that this particular law allows a bank to just pay whatever interest rate it pays on its savings accounts, which it already has made that determination. Are you saying that the other side could not bring in an economist, qualify them as an expert and prove you wrong? No. No, I'm not. And that—even if this Court reversed and the case proceeded, they could make that kind of a factual showing going forward. In a way, the significant interference standard is a kind of allowance to the bank to allow them to say, look, it's not discriminatory. It doesn't prevent the exercise of a national banking power. But once you look under the hood, it really does have significant effects and let's try to identify those. Thank you, Counselor. Good morning, Your Honors. Jeffrey Milsom on behalf of Citizens Bank. May it please the Court, the Rhode Island interest on escrow statute is preempted because it significantly interferes with the real estate lending powers granted to national banks under federal law. As Cantero instructs, in order to determine significant interference, this Court is required to look at the full body of federal precedent concerning preemption, look at the cases where the Court found preemption and the cases where the Court didn't, and determine where the line exists and on which side of the line the case before you falls. This case—in this case, the Rhode Island interest on escrow statute and its impact on federal law is very analogous and arguably greater than the interference posed by the cases in which the Supreme Court has found preemption. What cases do you think are significant interference? We've talked about Franklin. Do you think there's another case where it was actually decided on in favor of the bank on significant interference grounds? Yes. I think both Franklin and Fidelity Federal are particularly analogous. So Franklin, although you spoke of it earlier as a prevents case, I think it's actually a significant interference case. I can see it either way. I'm just saying Justice Breyer seems to talk about it as being like a prevents case, but maybe—but I see that greatness. Why isn't Anderson a significant interference but not a significant interference? The bank would like to keep the money, but they can't keep the money. They lose money. And here, you'd like to not pay interest, but you have to pay a small amount of interest. The bank would like to operate its savings accounts in a way that we don't turn over abandoned funds. That's how we want to do it. Savings is one of our things. Our incidental rule is we keep all the money, and the state says you can't. I think the big difference is federal law does not confer on banks the ability to keep dead people's money or to keep money that's lost. And does it infer a right on the bank to have a zero interest escrow account? Yes, it does. The federal law, the implicit federal power to offer escrow accounts, which is undisputed, is not qualified. It is not qualified. And the Rhode Island law qualifies it. It says it prevents—it actually prevents banks— I have an unqualified right to have savings accounts, which means I get to keep the money until the person asks for it back. That's what I understand a savings account to be. And now the state of Kentucky says that's not what it means. It means something else. How is that different? Well, what the Supreme Court found in Anderson is that the law of apportionment or a sheet is as old as the common law. So anybody doing business— How can you keep some people's money? That seems like kind of an old idea, too. You demand people give you money, and you pay interest on it. That seems like an old idea. Not with a checking account, Your Honor. That's exactly how a checking account works. You take people's money. Bank isn't holding that money. They're investing that money. They may hold a certain percent of it. Does your bank invest the money in escrow accounts? I think escrow accounts require administration. The bank certainly has costs. Does your bank, Citizens Bank, does it invest the money that is in escrow accounts to earn some kind of return on that money while it's holding it? I don't know. That wasn't—we don't have a factual record. And I'd like to stress—so sticking with this point, the Fidelity federal case involved due-on-sale clauses in mortgage contracts. And the agency that granted the federal power, just like the power, the incidental power in this case, did not qualify it. But wasn't that an express power? I'm sorry? Wasn't that an express provision? It was. So I think what I'm struggling with is you're saying there's no qualification on an implied power. How could there ever be a qualification on an implied power? It's implied. So there is no direct information from Congress about it, whereas the cases that you're citing, there was an express power that was granted. And the power expressly said you can do this, and then there was a significant obstacle to it saying, actually, you can only do it when it's reasonably necessary, which is a much smaller universe than you can always do it. So I'm not seeing exactly how that's the same here, where you have no express grant having to do with escrow accounts. I think you have to divine congressional intent. And you can do that, as Justice Aframe mentioned, by looking at TILA. And it does provide for interest on some escrow accounts for certain loans. You can look at the fact that Congress, going back to the 70s, has multiple times considered ruling on the issue of interest on escrow accounts and decided not to. They did a commission. They commissioned a study in 1973 to look specifically at interest on escrow accounts, and they decided not to require banks to pay interest on escrow accounts. So it's an incidental power, but your role is still to divine congressional intent. And I think all the indicia we have is that Congress did not intend to limit this power. Is this a substantial, significant, sorry, interference of this Rhode Island statute on your bank? So one of the things that it's important to remember, and very easy to blur, is that it's significant interference with bank power and not bank operations. A lot of cases, including Lethgo, it confuses that. So you can have escrow accounts. Yes. You have to pay what seems like a pretty small amount to the person who gave you the money. How is that significantly interfering with the power of having escrow accounts? Because the power to have escrow accounts is not qualified. The power as it exists allows banks to offer escrow accounts with or without interest. But that theory just means that there's no power of states to regulate the kind of products and services that a bank offers. And I heard that argument made in the Cantera-Orr argument by Attorney Blatt, and that is not the one the Supreme Court adopted. No, we're not arguing for a control test. We're arguing that you have to line this up with the precedent. This is the situation. What you just said to me is escrow accounts, which are nowhere. They are an incidental power. So you can't point to me in the Banking Act something about escrow accounts. It's nowhere. But now you're saying, one, it's nowhere, and two, it's unqualified. That just seems to me you're just saying anything we want to do that we can classify as an incidental power and then a state wants to do something around the edges of it, by definition it's preempted. That seems like it preempts almost everything. Well, I disagree. It may help you to view, as we do, Franklin as a case involving an incidental power. So as you did previously in the SPGGC case, this Court cited Franklin and described its holding as involving the incidental power to advertise or market the bank's products. So same thing, unqualified. An incidental power wasn't defined by Congress. Right, pre-Cantero, pre-Dodd-Frank. So that case is written under the time that it was written, but we've had developments in the law since SPGG, right? That's correct. That's correct. I'm talking about Franklin National. The incidental power was to advertise the bank's products, and New York prohibited the use of a word. They didn't prohibit advertising. They just prohibited the use of the word. And the Court was able to determine that that was significant enough interference to preempt the enforcement of the statute. And it's the same thing in this case. You have a power and you have a state statute that interferes. That was an express power to have savings accounts. And then they're saying you can't use the word savings, even though expressly Congress said you can have savings accounts. And so that's when, if you want to look at it as a prevents case, at least you're looking at express congressional language of something, and then there's something that's either limiting it or unwinding it or whatever. This is escrow accounts are nowhere. You're just telling me that's an incidental power, which I agree with. But then you're saying, and that incidental power comes with a, and nothing else the state wants to do. That seems different than Franklin. Well, we're not arguing for a control test. Our point is I believe, and perhaps it's easier to envision in the abstract, compare this case with the three cases considered by Barnett Bank on which no preemption was found. I mean, you've got two involving laws of general application. You can't even identify the bank power that's implicated. And the third is, I assume, the power to offer savings banks. We talked about savings accounts. We talked about that. It's the apportionment case where common law was consistent with the statute preexisting common law. Going back to the beginning, I believe the court said. One thing I'd like to address that you would. Before you do that. Sure. I'm having some trouble with the distinction that you drew between operations and power. So can you help me with that?  So in my mind, I mean, if I'm the district court here getting this in the first instance, I do want to hear from the economists. I want to know what kind of impact this state law has on this bank's ability to offer mortgage loans at a lower interest rate, which could be seen as power, could be seen as operations. So can you help me with that? I take it you don't want to have the economists battling. No. You want an up or down from us. That's correct. And I think that's what Quintero requires. So tell me the difference in your mind between operations and power. Where is the line drawn? Well, the line, I mean, power is kind of theoretical, which I think is uncomfortable. But, counsel, I don't think it is in the sense that the Supreme Court talks about it because the bank power here is the power for you to engage and make real estate loans. That's the power, just like they identified specific powers in the other cases. So let's just assume for a minute that's the power. So then what would be the answer to Judge Howard's question about what's the difference between the bank's power and operations? The bank's operation would call into question the cost of compliance, burden of compliance, all the things that the Supreme Court has said aren't relevant. I mean, in all the preemption cases, all of them, the burden or the trouble the bank would have to go through to comply was minimal to nonexistent. One thing that might be helpful because, you know, you don't have to take it from me. So two disparate courts. Is it also not relevant if it creates a high burden on the banks? Yes. Yeah. It's not relevant. And the Supreme Court precedent teaches that. And otherwise, you would have the situation, you know, what happens if facts change if you're doing an evidentiary-based assignment and, you know, the housing market changes in a dramatic fashion or interest rates go haywire? Do the banks get another trial, another shot at proving preemption? Never mind the potential for inconsistent rulings with respect to national banks able to amass different evidence you'd have. But, counsel, then what would be the purpose of the provision that the OCC can make these determinations on a case-by-case basis about a particular state law? Isn't that exactly to allow the banks to put in evidence to show that there's a unique set of burdens in a particular state? No. I think that's just the APA burden for the OCC's administrative action. And I don't think that's really has any nexus with what the court does under the Barnett Bank analysis. I think that's for the OCC in their exercise of their rulemaking authority. Well, then, the end point there is that if the OCC in one instance says it's preempted, then that would govern all. Same with a judicial decision, right? Not necessarily. Not necessarily. If you determine that this is an needs to be an evidentiary-based assessment, then, you know, citizens would go and try the case. No, I don't mean on the opposite. Taking your view. Well, I mean, the OCC ruling could still be challenged, but you're correct. OCC would decide plenary for all banks. In one case, and then it's over. Yes. So how does that jibe with case-by-case basis? I think case-by-case basis is issue-by-issue as opposed to bank-by-bank, state-by-state. So law-by-law. State law-by-state law. That's correct. One thing that, you know, you've asked about evidence, and I want to direct you to two district court cases that have come down since Cantero, both of which have applied the Cantero standard in thoughtful, well-reasoned opinions. One is from the Northern District of Illinois. It's called Illinois Bankers v. Raul. 2024 Westlaw 518-6840. And INRAE Capital One 360 Savings Account Interest Litigation from the Eastern District of Virginia. 2024 Westlaw 475-3821. Both of these district court judges apply the preemption. When did these decisions come down? They came down, I think they were issued November, December of 2024. Has either party notified us in their briefing or otherwise? No, we just found one last week. And so you're going to send us a 28-J letter with the citations? Yes, we'd be happy to. But what's interesting about both of these decisions is that these judges did the preemption analysis without reference to evidence. They did it exactly like Cantero instructs. Well, I guess you've said how to do that. You would just say, this limits how we can do escrow accounts, end of case. I mean, that's why you win. Well, no, you have to do the nuanced comparative analysis with precedent, but yes, that's how we win. That leads me, you say, because there's a power, we've defined it as escrow accounts, this limits it. That's it, right? Yeah, well, it's not necessarily. That's how I think this case comes out, but what's particularly interesting about the Eastern District case is that court was dealing with preemption arguments with respect to not a state statute, but state common law, claims asserted against the defendant. And they did the preemption analysis, and they drew the line, and they found different claims fell on different sides of the line. So some of the claims were preempted, but some weren't. And I believe that's exactly what Cantero intended, a nuanced comparative analysis that allows courts to, based on the application of analysis and common sense, draw that line. I ask this of the other side, but I mean, I'm not coming up with this. I think this is what Justice Kagan was sort of saying. You have prevent, you have discriminate. That's a lot of things, that's a lot of arguments the bank can already make, and a lot of the work will be done there. And then Congress says, and you know what, we're going to give you a little more, even more. And that wasn't what the Treasury Department wanted. But we're going to give you even more, which is, if you can show us that despite it not preventing, it not discriminating, and discrimination should do a lot of work, because states won't typically be passing onerous laws on their own banks, then come forward and show us why. Why is that not a good way to think about what was going on here, kind of a cascading and giving the bank one last chance if these other two things, which should do most of the work, don't? That significant interference is that last sort of stopgap for the bank, with some evidence. Because, respectfully, what Congress actually said is we love Barnett Bank. That's the standard. And that's not what Barnett Bank did. Barnett Bank looked at the case. Which is definitely a prevention case, right? Barnett Bank is a prevention case. Yeah, I agree with that. But I don't agree that Fidelity Federal and Franklin National were prevents cases. And this case can be characterized as a prevents case, like I said. Counsel, I think what I'm just still struggling with is you're saying that you're not arguing for the control test, but in your briefs you said that, you know, essentially this law should be preempted because it limits your flexibility. And I think that's the same argument that you've made to us. But every law limits flexibility. And so I don't ‑‑ it's different words, but I don't really see how that's any different than saying any law that controls what we do. And implied power, again, this is not even express. Any law that limits flexibility means any law that does anything to an implied power is no good. So how is that actually in substance as a practical matter different from the control test? Well, we're not arguing for a bright line test, and we can't. What we're trying to do when we're talking about flexibility and efficiency is draw parallels, draw analogies to the precedent Barnett Bank considered. Right. We're saying this ‑‑ Flexibility isn't the word used by Congress. It was significant prevention. So flexibility and significantly prevent are quite different, don't you think? Yes. But the Supreme Court in Cantero said, you determine, you analyze significant impact by doing a nuanced comparative analysis between the statute at issue and its impact on bank powers and the precedent relied on by Barnett Bank and Barnett Bank. So we're defining, we're saying, what is significant impact? Congress didn't tell us, and Cantero seemed to be frustrated, too, at this sort of ambiguous statute. All they said was look at the precedent. But they do put only if in quotes throughout Cantero, which suggests to me that the premise, the underlying purpose of this, was sort of an anti‑preemption idea. So only if one of these things exists should you preempt, which is not usually, at least that's not how typically you would see such a provision. And I noticed Cantero a few times sort of put that in quotes to sort of suggest that idea. So when you say to me, well, we do escrow accounts. It's an incidental power. And then once come in and tinker with that around the edges, that's preempted. That really strikes against the only if, and we're trying to protect consumers, that's the whole purpose of this, and we're going to let states do that. That's a typical traditional state thing. In Cuomo, they said banks have been regulated for 85 years. So I feel like it's not true to the thrust of what the statute was, which is a lot of things shouldn't be preempted. Yeah, you know, it's unfortunate because the statute is inconsistent in that regard, in that it does purport, I think, to suggest there's a presumption against preemption. But then it says Barnett Banks are a test, which Barnett Bank clearly applies a presumption of preemption. And, again, there is no clear, bright line. All you can do is compare the case before you with the precedent. Thank you, counsel. Thank you. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Yes. Thank you, and may it please the Court. Jonathan Taylor for the plaintiff's appellants. Just a few quick things in rebuttal. Number one, Judge Rickleman, I think you're exactly right. Although my friend abandons the control test, he does so in name only. And if you look at the same list of laws that they think are saved from preemption versus that are preempted, it's exactly the same list that was offered by Bank of America in Cantero adopting the control test. It's exactly the same list that the OCC preempted before it was expressly rebuked by Congress in 2010. And the Supreme Court in Cantero rejected the control test because, quote, it would preempt virtually all state laws that regulate national banks, at least other than generally applicable state laws such as contractor property laws, in conflict with the plain text of Dodd-Frank. And by a Supreme Court precedent, the same is necessarily true of my friend's proposed alternative test. And so I think you could just stop there if you wanted to in your opinion. I heard my friend mention Franklin and Fidelity as his two best cases, but both of those cases, as you noted, Judge Rickleman, relied on express powers. One, the use of the word savings. The other, the use of the phrase at its option. We have nothing like that here. And so what my friend proposes is a kind of, I guess you could think of it as being a control test on steroids, which is that there's an implicit power here that contains no implicit qualification and that that cannot be limited in any way. And that is a jarring proposal. I mean, I would note that the power to make contracts is an express power. The power to make real estate transactions is an express power, and yet we know that they can be limited. It would be bizarre to think that a power that is not expressed cannot be limited at all. And I think their response to this would be that there's some kind of a difference between generally applicable laws and banking-specific or financial-specific laws. But as Justice Scalia explained for the court in Cuomo, that distinction doesn't exist in the statute. And more to the point, Section 25 in Dodd-Frank speaks specifically to state consumer financial laws, and yet even so, Judge Aframe, it is framed as indecisively anti-preemption ways. And so my friend's argument, although he insists on reading a whole lot into words that are not in a statute, powers that are not in a statute, he would ignore the vast majority of words that are in the statute, Section 25B of Dodd-Frank. He has no account of what Congress was trying to do if it thought that the OCC had gotten it right in the first instance, if it thought that the tests were actually the tests that he has proposed. He has no account of why there would be a substantial evidence requirement. He has no account of why there would be a periodic review determination if it doesn't turn on facts. None of this would make any sense if he were right. I would ask you to reverse the court vote. Thank you. Thank you. Thank you, counsel. That concludes argument.